C. D. Thomas (State Bar. No. 171435)
Technology & Innovation Law Group, PC
1055 E. Brokaw Rd.
Suite 30-355
San Jose, CA 95131
(866) 535-2006
dthomas@tipatents.com

Beth A. Oliak (State Bar No. 230236)
oliakb@pennoliak.com
Edward A. Pennington (pro hac vice to be filed)
epennington@pennoliak.com
PENNINGTON OLIAK PLLC
1055 Thomas Jefferson Street, NW Ste. L35
Washington, DC  20007
(202) 897-2725

Attorneys for Plaintiff
INTERUM GROUP INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERUM GROUP INC., a Delaware Corporation, | Case No._____ |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | Civil Action No. |
| ZOOM VIDEO COMMUNICATIONS, INC., a Delaware Corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Interum Group Inc. ("Interum") brings this action for patent infringement against Zoom Video Communications, Inc. ("Zoom"), and for its Complaint alleges as follows:

1

**INTRODUCTION**

This case concerns Interum's groundbreaking innovations in the remote video conferencing space. These innovations were conceived and patented well before the global pandemic, which forced schools, businesses and even courts to conduct their studies, business meetings and court appearances through remote video terminals. Even though the pandemic (which lasted from approximately 2020 to 2022) has subsided, the use of video conferencing has continued effectively unabated. Remote working has become an accepted norm, and reliance on video conferencing technology is as strong after the pandemic as it was before.

**NATURE OF THE ACTION**

1.  This is a civil action for infringement of United States Patent No. 9,325,940 ("the '940 patent"). The '940 patent is generally directed to novel and innovative methods and systems for conducting remote video conferences amongst multiple participants at different locations, using different computers and accessing the internet with different bandwidth and connectivity limitations.  A copy of the '940 patent is attached as Exhibit A.

2.  Interum seeks judgment that Zoom has infringed, and continues to infringe, one or more claims of the '940 patent arising out of Zoom's commercialization of video conferencing services in the United States.

**THE PARTIES**

3.  Interum is a corporation organized and existing under the laws of Delaware with its principal place of business at 2819 Embassy Drive, West Palm Beach, FL 33401.

4.  Zoom is, upon information and belief, a Delaware Corporation having its principal place of business at 55 Almaden Boulevard, 6th Floor, San Jose, CA 95113. Zoom can be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

COMPLAINT FOR PATENT INFRINGEMENT

**JURISDICTION AND VENUE**

5.     This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271, for infringement of the '940 patent.

6.     The Court has exclusive subject matter jurisdiction over the matters pleaded herein under 28 U.S.C. §§ 1331 and 1338(a).

7.     On information and belief, Zoom's United States headquarters are located in San Jose, California. Accordingly, this Court has personal jurisdiction over Zoom.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Zoom has committed acts of infringement in this District, including by providing infringing services to participants within the District. Additionally, Zoom has a regular and established place of business in the District.

**FACTUAL BACKGROUND**

9.     Interum is a research and development company founded by telecommunications pioneer Patricia Mathis ("Mathis") and Vladimir Smelyansky ("Smelyansky"), one of the lead innovators in the field of Voice (or Video) over Internet Protocol, commonly referred to as "VOIP".  VOIP, which fundamentally relies on packetized digital data, has transformed the telecom industry into what it is today.

10.     Mathis and Smelyansky have been at the forefront of the telecom transformation. Mathis has been a thought leader and entrepreneur in telecommunications for over forty years, a time period which started with telephone booths and cooper wire strung on telephone poles, to the present where the wireless handset is ubiquitous, and the phone is now a computing device rather than just a speaker and microphone.

11.     Mathis played a key role as strategic advisor to both MCI and Sprint in post-divestiture environment. By the 1990s, her Washington-based consulting team conducted several high-profile evaluations of nascent technologies in both the public and private sectors, including the development of strategies for both the United States

Patent and Trademark Office ("USPTO") and the World Intellectual Property Organization ("WIPO") to adopt digital text and image search tools. Mathis founded several start-up telecom companies between 1995 and 2008. She has also served on both public and private corporate boards and as a Trustee of several major universities.

12.  Mathis has led several national task forces commissioned by Congress or the President to conduct complex data analysis. She has served on the staff of three US Presidents and is a former Assistant Secretary of the United States Treasury. In her Treasury role, she crafted the data analysis that convinced a federal court to draw evidentiary conclusions based on multiple regression algorithms. Mathis also led the task force on data retrieval that allowed President Carter to freeze the Iranian assets in 1979.  She developed the strategy and oversaw the transition of the Executive Branch for President-elect Bill Clinton. In addition, she is the author of numerous monographs on workplace behavior, one of which led to the passage of the Whistleblower Protection Act of 1989, 5 U.S.C. 2302 (b) (8)- (9), Pub. L. 101-12 as amended.

13.  With Mathis, Smelyansky co-founded XCastLabs, Inc. and has served as its Chief Technology Officer from the beginning. He has more than twenty-five (25) years of leadership experience in the deployment and deployment of cutting-edge technologies, which include image and voice recognition, real time TCP/IP networking, telephony and VoIP communications. He led the four-year product development of the unified communications technology provided by Webley Systems, one of the early industry leaders in the convergent technology industry.

14.  A team led by Smelyansky conceptualized and developed the first ever session initiation protocol or "SIP" based Unified Communications system. Smelyansky was also a founder of start-up initiatives, including Digisoft Inc., which provided consulting professional services to such companies as Price Waterhouse, TDK Corporation, Anderson Consulting (Accenture), Unisys, United Airlines, Office

Max and other Fortune 100 companies. Smelyansky's advanced graduate education was completed at Kiev University in Applied Mathematics and Computer Science.

15.  The collaboration between Mathis and Smelyansky began in the mid-1990s when Mathis founded an enterprise that developed and introduced the first voice-recognition software solution to the market. Smelyansky was recruited to join the project as the Chief of Engineering. By the late 1990s, their collaborative efforts had led to the development and deployment of the first soft-switching solution into PacBell's carrier switching. Shortly thereafter, the team introduced its SIP-based software solution into the network of a major carrier for the first time in history.

16.  Successes of the type noted above were followed by further successful development and deployments in the field of telecommunications. By 2002, Smelyansky's engineering team had refined its SIP-based technology into a unified business software product that would enable small businesses to have the same capabilities as large carriers. Their innovations fueled the competitive opportunities envisioned by the passage of the Telecommunications Act of 1996.

17.  By 2004, the team had developed over 300 features embodied in its signature software that supported intelligent Hosed IP-PBX and SIP Trunking technology. This solution offered the same or better quality and reliability but with even more flexibility.

18.  Mathis and Smelyansky, and engineers working under their supervision, continued to anticipate and develop software solutions that anticipated future market trends driven by the acceleration of unified communication. Their vision included the consolidation of all communication solutions and activities into "unified devices", what are now known as "Smart TV" or "Smart Phones" or "Smart Houses".

19.  During the time that these break-through technologies were being developed, Mathis and Smelyansky filed for and obtained numerous U.S. patents. One patent that was filed in 2009, entitled "Unified Communications Center", provided, among other things, means to allow a tv watcher to observe a screen runner

identifying an incoming call that the watcher could direct to voice mail or answer through a unified remote control. A user could simultaneously call up an intercom or security monitor screen to see on the tv screen who was ringing the doorbell without interrupting any programming. By 2002, a Smelyansky engineering team had made a video softphone available well before market adoption.

### THE '940 PATENT

20. The '940 patent, identifying Smelyansky as the inventor, was filed on May 13, 2010, as application serial number 12/779,794, entitled "Video Class Room," and issued on April 26, 2016. A true and correct copy of the '940 patent is attached hereto as Exhibit A.

21. Interum owns the entire right, title and interest in and to the '940 patent, including the right to sue and recover damages, including damages for past infringement.

22. The '940 patent has 39 claims, four (4) of which are independent (1, 11, 21, 30) and the remaining 35 of which are dependent.

23. The invention is described as "A method, system, and computer program product for providing full two-way interaction among participants at a large number of locations." (*See* '940 patent at col. 3, lines 17-19.) An example of a system 100 implementing the invention is shown at FIG. 1a. (*id.* at col. 3, lines 20-21):



24. "System 100 includes a presenter location 102, such as a classroom, a network center 104, a network 106, and a plurality of computer systems at remote

locations, such as participant computers 108A-N." ('940 patent at col. 3, lines 21-24.) An example of a presenter location 102 is shown in FIG. 1b, shown below (*id.* at col. 3, lines 47-48).



Fig. 1b

25.   "Presenter location 102 is a location, such as a classroom, where a presenter and/or moderator, such as a teacher or conference moderator, provides a presentation, such as a lecture, recitation, etc. and/or moderates an interactive session, such as a discussion, question and answer session, etc. Presenter location 102 is linked to network center 104, which includes plural application servers which provide the computing power needed to provide the presentation services. Network center 104 is further linked to remotely located computers 108A-N via network 106. Network 106, which may include any type of private or public data network, such as a LAN, a WAN, the Internet, etc., connects presenter location 102 and participant computers 108A-N for carrying two-way voice, video, and data between presenter location 102 and participant computers 108A-N." ('940 patent at col. 3, lines 24-39.)

26.   Although the '940 patent is entitled "Video Class Room", the use of the invention in an educational setting is just one of its many contemplated uses and, by particular reference to the specification (col. 3, lines 40-46), it is clearly not so limited.

27.   The invented system provides "full two-way interaction among participants at a large number of locations." ('940 patent at col. 3, lines 18-19.)

28.  "The system can automatically detect who is speaking, and using multi-speaker audio capabilities, emulate from which part of the presenter's monitor audio is coming. That would allow the presenter to more easily determine which student is talking." ('940 patent at col. 5, lines 42-46.)

29.  The invented system in the '940 patent coordinates audio and video using audio effects. "An example of this spatial audio-video coordination in system 100 is shown in FIG. 2. FIG. 2 shows how audio associated with particular participants are associated with the video for those participants." ('940 patent at col. 5, lines 46-50.)

30.  The invented system "provides the capability to selectively transmit the video/audio streams in a number of arrangements." ('940 patent at col. 4, lines 52-53.) The '940 patent describes an example default configuration of the invented system in which the presenter sees all of the participants while each participant only sees the presenter (and themselves). ('940 patent at col. 5, lines 2-5.)

31.  When the invented system detects a participant speaking, it causes the audio and video streams of that participant to appear on the screens of all the other participants. When the invented system detects that the participant has stopped speaking, the invented system configuration reverts to the default configuration in which each participant only sees the presenter (and themselves). "For example, if a participant begins speaking, the system may detect this and automatically transmit that participant's audio and video stream to all participants. When the participant stops speaking, the system may detect this and automatically return to the default display." ('940 patent at col. 5, lines 20-25.)

32.  Thus, the '940 patent illustrates an example of providing audio-video coordination in which an audio stream is detected, which causes a video stream image that is associated with the detected audio stream to be seen on a display screen, altered on a display screen, and/or removed from a display screen. "For example, in a classroom setting, the teacher may say 'John Case asked what the speed of sound is.' The system would recognize this speech, detect the name of the student, determine

8

that the name is known, and determine which audio/video stream belongs to that student. This system may then alter the display of that student's audio/video stream as a result." ('940 patent at col. 5, lines 27-33.)

33. "An exemplary flow diagram of a process 300 of operation of the system shown in FIG. 1a is shown in FIG. 3." (*Id.* at col. 7, lines 3-4.) FIG. 3, shown below, is described at col. 7, lines 3 to 30 of the '940 patent.

### Fig. 3



## BACKGROUND OF THE INVENTION OF THE '940 PATENT

34. The '940 patent draws upon many of the experiences and technical developments overseen by Mathis and Smelyansky up to the time of filing of the patent application. The title of the '940 patent further draws upon one of the first and foremost anticipated uses of the technology, in the field of education.

35. Prior to the '940 invention, some universities had begun introducing learning management systems for delivering course content over the world wide web. These portals allowed faculty and students to engage in dialogue through

9

collaborative chat boards, expanding on the type of academic exchanges made possible through "list servers" that were popular in the late 1990s among academics and researchers with shared interests. But like the "list servers," these on-line learning solutions lacked the nascent features of unified communications (voice and video transmission, text to speech and speech to text) and had no real-time interactive features or ability for quick access to multiple databases.

36.   Mathis was intimately familiar with the shortcomings of the available remote learning tools prior to the '940 invention because she was a Fellow at Harvard Divinity School between 2002 and 2004 and leading an interdisciplinary program of business ethics for graduate students at the Kennedy School for Public Policy, the Harvard Law School and the Harvard Business School, where each department managed their own communication tools. The Video Class Room concept was the first illustrative example of how collaborative communities could work in a modern technological world.

37.   Smelyansky cast these concepts into the technology identified in the '940 patent but with the knowledge and vision that the technology and tools were applicable to any situation where community and collaboration were required.

38.   The '940 patent vision not only includes what is now known as "desk top collaboration" but also the much broader collaboration that would produce an emergence of "communities", i.e., professional groups, friends and family, churches, corporations, etc.

39.   By the second decade of the twenty-first century, some solutions were introduced by large corporations that were mostly directed at business communities; however, they were expensive and less consumer friendly. Then, the COVID pandemic ignited the market with a need to simultaneously "live remotely and be together". As a result, the vision that the Mathis/Smelansky team had imagined almost two decades earlier finally became a reality as their technology was widely adopted.

## ZOOM'S INFRINGING PRODUCTS AND SERVICES

40.   Zoom has become one of the best-known communication platforms for providing video conferencing services.  On information and belief, Zoom's revenues at least doubled during the pandemic as students learned remotely and workers worked remotely. Friend groups, who were accustomed to meeting at bars or restaurants, health clubs or libraries prior to the pandemic, found themselves meeting virtually, online via Zoom video conferencing services.

41.   An essential feature of Zoom's video conferencing platform is that a large number of participants in different locations who have different device and network capabilities can join a meeting whereby the video and audio aspects of the meeting are coordinated in such a way that the meeting occurs with minimal interruptions.

42.   The video conferencing service offered and hosted by Zoom is referred to as "Zoom Meetings". On information and belief, Zoom offers a number of "plans" that include Zoom Meetings as a primary feature. Zoom offers a free plan ("Zoom Basic") which provides a 40-minute time limit for meetings of 3 to 100 people. Zoom also offers paid plans, such as "Zoom Pro", "Zoom Business", "Zoom Business Pro" and "Zoom Enterprise". Zoom Pro eliminates the 40-minute time limit of Zoom Basic. Zoom Business and Zoom Business Pro further allows users to host meetings that include up to 300 participants. Zoom Enterprise allows users to host up to 500 participants in a single meeting (which can be increased to 1,000 participants with an optional bundle), referred to as "Zoom Large Meetings". Zoom also offers plans specifically for "Education".

43.   On information and belief, Zoom launched an AI-powered "Zoom Workplace" platform in early 2024. Prior to that time, the platform utilized by Zoom for providing Zoom Meetings was "Zoom One". As part of its effort to replace the Zoom One platform with the Zoom Workplace platform, Zoom will rename the plan names referred to above by including the word "Workplace".

44.   Zoom Video Webinar is a platform designed to facilitate large-scale virtual events with video, audio and screen sharing, enabling up to 100 video panelists to broadcast to a large audience (of up to 50,000 attendees located anywhere globally) while maintaining control over interactions by restricting attendees to view and listen mode. During a webinar a presenter can momentarily promote any attendee to be a panelist so they can turn on their audio and video. The features and capabilities of Zoom Video Webinar are described in the document entitled "*Zoom Video Webinar FAQ*", dated July 2020, at https://explore.zoom.us/media/zoom-video-webinars-faq.pdf.

## CLAIMS FOR PATENT INFRINGEMENT

45.   The allegations provided below are exemplary and without prejudice to Interum's infringement contentions provided pursuant to the Court's scheduling order and local rules.

46.   On information and belief, Zoom's video conferencing platforms, such as the Zoom One, Zoom Workplace and Zoom Video Webinar platforms, which offer and host video conferencing services such as Zoom Meetings and Zoom Video Webinars (collectively the "Zoom Accused Products and Services"), meet all the claim limitations of at least Claim 1 of the '940 patent.

47.   Claim 1 recites a "*method for providing video classroom presentation services*".

48.   Zoom provides a video conferencing platform that allows full two-way interaction among a host and participants at several different locations. According to an April 2020 white paper entitled "*Client Connection Process*" (hereinafter referred to as the "White Paper"), available on Zoom's website at https://explore.zoom.us/docs/doc/Zoom_Client_Connection%20Process_Whitepaper.pdf, page 1, "*Zoom's connection process ensures that whenever someone attempts to access the platform there is an optimized path to Zoom's geographically distributed and highly available infrastructure.*" Moreover, the services provided by Zoom

specifically include video classroom presentations. According to an April 24, 2020 feature (as updated on September 22, 2022) posted on Zoom's blog at https://www.zoom.com/en/blog/zoom-for-education-top-10-frequently-asked-questions/, entitled "*Zoom for Education: Top 10 Frequently Asked Questions*", at page 1 (emphasis added), "*Remote virtual learning has become the new normal for many teachers, administrators, students, and parents . . . we want to provide resources to ensure users are creating secure and effective <u>virtual classrooms</u> using Zoom . . . [Zoom] Meetings are designed to be highly collaborative, giving attendees the ability to use audio and video, share their screen, and annotate in a live, interactive environment.*"

49.   Claim 1 further recites "*receiving a real-time audio stream and a plurality of real-time video streams of a video classroom presentation, wherein at least some of the plurality of received video streams have at least two of different frame rates, resolutions, and encoding*".

50.   Zoom is described on page 1 of the White Paper as a "*cloud platform for video and audio conferencing, collaboration, chat, and webinars across mobile devices, desktop computers, telephones, and room systems.*" A diagram of the architecture for Zoom's connection process, through the Zoom cloud, is shown on page 1 of the White Paper, as follows:



COMPLAINT FOR PATENT INFRINGEMENT

51.    The Zoom Client is the host and participants' method of accessing the Zoom cloud for purposes of a Zoom Meeting or Zoom Video Webinar session (*see* White Paper at pages 1-2). A Zoom Multimedia Router (hereinafter referred to as an "MMR") is a server which is responsible for hosting the session (*id.*). The MMR receives, transmits and distributes audio streams, video streams and content amongst the host and participants in the session through the Zoom cloud.

52.    According to the feature "*Here's How Zoom Provides Industry-Leading Video Capacity*" dated June 26, 2019 (last updated on September 29, 2022), provided on the Zoom Blog at https://www.zoom.com/en/blog/zoom-can-provide-increase-industry-leading-video-capacity/, Zoom's architecture "*has been optimized to handle video's demanding requirements*" by its distinctive key features, two of which are set out below:

> "*3.    Multi-bitrate encoding: In addition to stream routing, each stream by itself can adjust to multiple resolutions. This eliminates the need to encode and decode the streams for each endpoint, optimizing performance and scalability. This also enables Zoom to provide different levels of video quality based on the device and network capabilities.*"
>
> *4.    Application layer quality of service: Our proactive quality-of-service application layer optimizes the video, audio, and screen-sharing experience specifically for each device and the available bandwidth, resulting in the best possible user experience across any network.*"

53.    The various layers of Zoom's architecture are described on pages 2-4 of the Zoom document entitled "*Zoom Architected for Reliability*" (hereinafter referred to as the "Zoom Architecture Document") dated September 2019, at https://zoomgov.com/docs/doc/Zoom_Global_Infrastructure.pdf. The Reactive Quality of Service Layer "*monitors the client's bandwidth, packet loss, latency and jitter*" and "*notifies the up layer to take the best action within adaptive technology.*" The Adaptive Codec in Session Layer is comprised of multiple layers which "*optimize*

*the video frame rate and resolution and provide superior quality and reliability for various network environments and different devices*".

54.   The foregoing demonstrates that Zoom's video architecture accommodates various device and network capabilities which include frame rates, resolutions and encoding.

55.   In an alternate embodiment, the MMR is deployed within a virtual machine in an on-premise Zoom Meeting Connector whereby all meeting traffic (video, voice, in-meeting chat, and data sharing) received and transmitted by the MMR is done so through a private cloud. This embodiment is described in a "Zoom Support" document entitled "*Zoom On-Premise Deployments",* dated January 4, 2024, provided at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0060084 and a "Zoom Support" document entitled *"Meeting connector core concepts*", dated August 8, 2022 (updated on February 23, 2024), provided at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0061815. The MMR otherwise operates in the same way described above.

56.   Claim 1 further recites "*receiving a real-time audio stream and a real-time video stream of each of a plurality of participants to the video classroom presentation, wherein the receiving comprises receiving a real-time text stream [from] each of a plurality of participants to the video classroom presentation*".

57.   As previously stated, the MMR is capable of receiving and transmitting "content" amongst the host and participants. The Zoom "chat" feature allows participants to send instant text messages to one or more other participants during a Zoom Meeting or Zoom Webinar session: *see* "Zoom Support" documents entitled "*Chatting in a Zoom meeting*", dated January 14, 2024, at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0064400#:~:text=chats%20between%20participants.,While%20in%20a%20meeting%2C%20tap%20More%20and%20then%20tap%20Chat,to%20send%20your%20private%20m

essage and "*Chatting in a Zoom webinar*", dated December 2, 2023, at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0067761.

58.  Claim 1 further recites "*selectively transmitting the real-time audio stream and the plurality of real-time video streams of the video classroom presentation and the real-time audio stream and the real-time video stream of each of the plurality of participants to a video classroom presentation location and to each of the plurality of participants, wherein at least a plurality of real-time video streams are transmitted concurrently to each of the plurality of participants, wherein at least some of the plurality of transmitted real-time video streams have different frame rates, resolutions, or both*".

59.  As described above, Zoom's video architecture accommodates various device and network capabilities which include frame rates, resolutions and encoding. According to a document entitled "*Zoom connection problems: Video bandwidth*", located at https://canvas.stanford.edu/courses/73606/pages/zoom-connection-problems-video-bandwidth (emphasis added): "*Zoom automatically adjusts the streaming resolution to match what each participant's internet can handle. Below 720p, it may shift to 640 or 360. Also, the way Zoom works is that bandwidth requirements do not increase as more people join.  Each individual user sends in their video feed, Zoom then takes all the feeds essentially merges all the feeds into a 720 video that is sent to all the participants.*" Thus, the MMR receives video streams from the host and participants, merges the video streams and then transmits the video streams concurrently to the host and participants. The MMR is able to selectively transmit audio streams and video streams to the host and/or is able to selectively transmit audio streams and video streams to the participants.

60.  Claim 1 further recites "*receiving input from a presenter at a real-time interface, the input indicating a configuration of real-time audio streams and real-time video streams, the configuration including: a selection of at least one real-time audio stream and at least one real-time video stream to be transmitted to each of the*

*plurality of participants, a selection of at least one real-time audio stream and at least one real-time video stream that is to be transmitted to each of the plurality of participants upon detection of at least one condition, and the at least one condition*".

61.   The Zoom "focus mode" feature allows the host (i.e., presenter) to restrict the participants from seeing each other so they are not distracted by the other participants. Once the focus mode feature has been activated by the host, a participant will only see the host's video, the videos of any participants "spotlighted" by the host, and the participant's own video. The focus mode feature is described in a "Zoom Support" document entitled "*Using focus mode*", dated November 9, 2023, located at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0063004. The document provides the following example of the participant view when one participant is spotlighted:



62.   The Zoom "spotlighting" feature is described in a "Zoom Support" document entitled "*Spotlighting participants' videos*", dated November 9, 2023, at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0066300 ("*Spotlight video puts up to 9 participants as the primary active speakers for all participants, and participants will only see these speakers. Spotlighting can also be done during screen sharing. This feature is often used to spotlight a keynote speaker.*") Instructions as to how to spotlight a participant are provided as follows:

## How to spotlight participants

**Windows | macOS**

1.    Start a meeting or webinar as the host, or join and be assigned co-host.

2.    Hover over the video of the participant you want to spotlight and click the ellipsis icon ● ● ●.
      Additional options for that participant are displayed.

Click **Spotlight for Everyone**.



3.    (Optional) To spotlight additional participants (up to 9 total), follow steps 2 and 3 again as needed, clicking on Add Spotlight instead.



63.    Claim 1 further recites "*providing audio-video coordination using audio effects on at least one real-time audio stream transmitted to the video classroom presentation location to indicate a real-time video stream corresponding to the real-time audio stream*".

64.    The MMR performs the recited "*providing audio-video coordination using audio effects*".

65.    The Zoom "Speaker View" feature is described in the "Zoom Support" document entitled *"Adjusting your video layout during a virtual meeting"*

18

(hereinafter referred to as the "Video Adjustment Support Document"), dated December 12, 2024, located at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0063672. The Video Adjustment Support Document shows that the MMR performs the recited "*providing audio-video coordination using audio effects*" as follows:

> "*Speaker view will switch the large video window between who is speaking with 3 or more participants in the meeting. If it is just you and one other participant, your video will be smaller at the top and their video will appear below.*"

66.  The Zoom "Gallery View" feature is also described in the Video Adjustment Support Document, which shows that by using an audio effect in the form of detecting an audio stream of a speaking participant, the MMR moves or modifies the video stream associated with the detected audio stream, as follows:

> "*When in Gallery view and a participant begins speaking, that active speaker is relocated to the current page you are viewing and highlighted, making it easier to recognize who is speaking.*"

67.  When "Speaker view" or "Gallery view" is enabled, the MMR identifies a presently existing audio stream, identifies the presently existing video stream associated with the audio stream, and then makes the video stream larger (if in Speaker mode) or moves and highlights the video stream (if in Gallery view), to help the host identify who is speaking. This is described in the Video Adjustment Support Document, as follows:

> "*Speaker view will switch the large video window between who is speaking with 3 or more participants in the meeting . . . When in Gallery view and a participant begins speaking, that active speaker is relocated to the current page you are viewing and highlighted, making it easier to recognize who is speaking.*"

68.  An example of Speaker view, where the speaker is in the large video window, is provided below:



69.  An example of Gallery view, wherein the speaker in row 2, column 3 is highlighted, is provided below:



70.  Similar to the invented system of the '940 patent, the MMR provides audio-video coordination using audio effects by detecting a pre-existing audio stream of a speaking participant, identifying a pre-existing video stream associated with the audio stream and applying an adjustment to either the audio stream or the video stream to help the host identify who is speaking.

71.  By reference to the '940 patent at col. 5, lines 27-33, the invented system provides coordination of audio and video as follows:

"*For example, in a classroom setting, the teacher may say 'John Case asked what the speed of sound is.' The system would recognize this speech, detect the name of the student, determine that the name is known, and determine which*

20

*audio/video stream belongs to that student. This system may then alter the display of that student's audio/video stream as a result."*

72.  The MMR coordinates display of a video stream with the detected audio stream to achieve the result of the host being able to quickly focus on the participant who is speaking in a manner comparable to the invented system of the '940 patent.

73.  Claim 1 further recites "*wherein the frame rate, resolution, and encoding of each real-time video stream is determined, adjusted, or converted in real-time before and during transmission of each real-time video stream depending on the subject matter of the real-time video stream and the number of real-time audio streams and real-time video streams received from participants in order to provide a determined service or quality of service*".

74.  Again, Zoom's video architecture accommodates various device and network capabilities which include frame rates, resolutions and encoding. On page 3 of the Zoom Architecture Document, Zoom's "Multi Bitrate Encoding" is contrasted with traditional rate transcoding as follows: "*The Distributed Conference Layer utilizes subscription information for switch technology with no transcoding or mixing. Traditional conferencing services always transcode the streams and mix them together. Zoom's switching method uses less CPU and memory, giving our system a massive scalability difference.*" Based on the foregoing, the MMR can encode video streams together irrespective of the bitrate of each video stream. Thus, the frame rate, resolution and encoding of each real-time video stream can be determined, adjusted or converted in real-time by the MMR before and during transmission.

## COUNT I
## INFRINGEMENT OF THE '940 PATENT

75.  Interum incorporates by reference the allegations set forth in paragraphs 1-74 as though fully set forth herein.

76.   The Zoom Accused Products and Services directly infringe, literally or under the doctrine of equivalents, at least Claim 1 of the '940 patent, in violation of 35 U.S.C. § 271(a).

77.   The Zoom Accused Products and Services infringe at least Claim 1 of the '940 patent indirectly by induced infringement and/or contributory infringement.

78.   Zoom is willfully and deliberately infringing the '940 patent. On information and belief, before the filing of the Complaint and no later than that date, Zoom was aware of the existence of the '940 patent, at least through its communications with Interum. By letter dated January 6, 2023, Interum brought the '940 patent to the attention of Zoom and suggested that Zoom should consider taking a license from Interum. Zoom did not provide any response to that letter. Moreover, the '940 patent was cited as prior art in respect of patent application 17/589,156, entitled "*Motion-Based Frame Rate Adjustment for In-Person Conference Participants*", filed on January 31, 2022, which issued as United States Patent No. 11,563,790 on January 24, 2023, to Zoom as the assignee. Zoom therefore has had knowledge of the '940 patent and that its activities infringe the '940 patent.

79.   Zoom has provided the Zoom Accused Products and Services to its customers and, on information and belief, instructions to use the Zoom Accused Products and Services in an infringing manner, while being on notice of or willfully blind to the '940 Patent and Zoom's infringement. Therefore, Zoom knew or should have known of the '940 patent and of its own infringing acts or deliberately took steps to avoid learning of those facts.

80.   Zoom knowingly and intentionally encourages and aids at least its end-user customers to directly infringe one or more claims of the '940 Patent.

81.   Upon information and belief, Zoom has provided the Zoom Accused Products and Services to customers through its website and various third-party application stores (e.g., the Apple and Google stores) (as set out at https://zoom.us/download), as well as instructions to such customers so that they will

use the Zoom Accused Products and Services in a manner that infringes the '940 patent.

82.   Zoom's end-user customers directly infringe at least claim 1 of the '940 patent in their intended manner to infringe. Zoom induces such infringement by providing infringing products and instructions to enable and facilitate infringement, knowing of, or being willfully blind to, the existence of the '940 patent. Zoom specifically intends that its actions will result in infringement of at least one or more claims of the '940 patent or subjectively believes that its actions will result in infringement of the '940 Patent, or took deliberate steps to avoid knowing of those facts.

83.   On information and belief, Zoom has induced and continues to induce the infringement of the '940 patent by others in violation of 35 U.S.C. § 271(b), including by: (i) providing the Zoom Accused Products and Services to users who pay for subscriptions to the Zoom Accused Products and Services, and/or users who receive free Zoom Accused Products and Services; (ii) instructing users to use the Zoom Accused Products and Services in an infringing manner; and (iii) knowing that such use of the Zoom Accused Products and Services by users constitutes a direct infringement of one or more claims of the '940 patent.

84.   On information and belief, Zoom also has contributed and continues to contribute to the infringement of the '940 patent by others in violation of 35 U.S.C. § 271(c), including by: (i) providing the Zoom Accused Products and Services to users; and (ii) knowing that the Zoom Accused Products and Services are especially made for use in infringing one or more claims of the '940 patent, and are without substantial non-infringing uses. More particularly, the software modules and code that implement and perform the infringing functionalities identified above are specially made and adapted to conduct the functionality and do not have any substantial noninfringing uses.

85.   Zoom's activities are without license or permission from Interum.

86.    Zoom's infringement has been and continues to be willful and deliberate, entitling Interum to enhanced damages and attorneys' fees.

87.    Zoom's infringement is exceptional and entitles Interum to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

88.    Interum has been damaged by Zoom's infringement and will continue to be damaged unless Zoom is enjoined by this Court. Interim has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Interum, and the public interest is not dis-served by an injunction.

89.    Interum is entitled to recover from Zoom all damages that Interum has sustained as a result of Zoom's infringement of the '940 patent, including without limitation lost profits and not less than a reasonable royalty.

## JURY DEMAND

90.    Interum demands a jury trial as to all issues that are triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Interum respectfully prays for relief against Zoom as follows:

(a)    Judgment and declaration that Zoom has infringed and continues to infringe one or more claims of the '940 patent under 35 U.S.C. § 271(a), (b), and/or (c);

(b)    enjoining Zoom, their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries and parents, and all other acting in concert or privity with it, from infringing the '940 patent pursuant to 35 U.S.C. § 283;

(c)    An accounting of all damages sustained by Interum as a result of Zoom's infringing activities;

(d)    An award of damages pursuant to 35 U.S.C. § 284 in an amount according to proof, and in any event no less than a reasonable royalty;

(e)    An award of costs and expenses pursuant to 35 U.S.C. § 284 or as

24

otherwise permitted by law;

(f)     An award of treble damages pursuant to 35 U.S.C. § 284, including on the basis that Zoom aware of the '940 patent;

(g)     An award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

(h)     An award of prejudgment interest on all damages awarded to Interum;

(i)     An award of post-judgment interest on all amounts awarded to Interum from the date of the judgment; and

(j)     Any and all other relief that the Court deems just and proper.

COMPLAINT FOR PATENT INFRINGEMENT

Dated: May 7, 2025          Respectfully Submitted,

PENNINGTON OLIAK PLLC


_/s/ Beth A. Oliak_
BETH A. OLIAK (State Bar No. 230236)
oliakb@pennoliak.com
EDWARD A. PENNINGTON (_pro hac vice_ to be filed)
epennington@pennoliak.com
1055 Thomas Jefferson Street, NW Ste. L35
Washington, DC 20007
(202) 897-2725

C. D. Thomas (State Bar. No. 171435)
Technology & Innovation Law Group, PC
1055 E. Brokaw Rd.
Suite 30-355
San Jose, CA 95131
(866) 535-2006
dthomas@tipatents.com

_Attorneys for Plaintiff_
_INTERUM GROUP INC._

COMPLAINT FOR PATENT INFRINGEMENT